1  JOSHUA M. DICKEY
   Nevada Bar No. 6621
2  PAUL C. WILLIAMS
   Nevada Bar No. 12524
3  REBECCA L. CROOKER
   Nevada Bar No. 15202
4  BAILEY❖KENNEDY
   8984 Spanish Ridge Avenue
5  Las Vegas, Nevada 89148-1302
   Telephone:  702.562.8820
6  Facsimile:  702.562.8821
   JDickey@BaileyKennedy.com
7  PWilliams@BaileyKennedy.com
   RCrooker@BaileyKennedy.com
8
   *Attorneys for Plaintiffs*
9

10                 UNITED STATES DISTRICT COURT
                       DISTRICT OF NEVADA
11

12  SUNRISE HOSPITAL AND MEDICAL CENTER,      Case No.
    LLC; SUNRISE MOUNTAINVIEW HOSPITAL,
13  INC.; and SOUTHERN HILLS MEDICAL           **COMPLAINT**
    CENTER, LLC,
14
15                         Plaintiffs,

16           vs.

17
    BLUE SHIELD OF CALIFORNIA, INC.; and
18  KEENAN & ASSOCIATES, INC.,

19
                           Defendants.
20

21       Plaintiffs, Sunrise Hospital and Medical Center, LLC, d/b/a Sunrise Hospital & Medical

22  Center; Sunrise MountainView Hospital, Inc., d/b/a MountainView Hospital; and Southern Hills

23  Medical Center, LLC, d/b/a Southern Hills Hospital & Medical Center (collectively "Plaintiffs" or

24  "the Hospitals"), hereby complain of Defendants Blue Shield of California, Inc. ("BCSA") and

25  Keenan & Associates, Inc. ("Keenan") (jointly, "Defendants") as follows:

26

27

28

STATEMENT OF FACTS

A.    PARTIES

1.    Plaintiff, Sunrise Hospital and Medical Center, LLC d/b/a Sunrise Hospital & Medical Center ("Sunrise") is a Delaware limited liability company with its principal office in Clark County, Nevada.

2.    Plaintiff, Sunrise MountainView Hospital, Inc. d/b/a MountainView Hospital ("MountainView") is a Nevada corporation with its principal office in Clark County, Nevada.

3.    Plaintiff, Southern Hills Medical Center, LLC d/b/a Southern Hills Hospital & Medical Center ("Southern Hills") is a Nevada limited liability company with its principal office in Clark County, Nevada.

4.    Defendant, Blue Shield of California, Inc. ("BSCA"), is a corporation organized under the laws of the State of California doing business in Nevada. BSCA's primary place of business is in the State of California. BSCA does not maintain a regular place of business in Nevada and does not have a designated agent for service of process in the State of Nevada; however, it conducts business in Nevada. BSCA's home office is located at 60112th Street, Oakland, California 94607. BSCA is a licensee of the Blue Cross and Blue Shield Association and is licensed to offer Blue Cross and Blue Shield branded health insurance plans in the State of California. As explained below, BSCA's Subscribers are not confined to the State of California, and routinely receive hospital services in other states, including Nevada, for which BSCA is responsible.

5.    Defendant, Keenan & Associates, Inc. ("Keenan"), is a corporation incorporated under the laws of the State of California and doing business in Nevada. Keenan's principal place of business is in California. Keenan's home office is located at 2355 Crenshaw Boulevard, Suite 200, Torrance, California 90501. Keenan administers one of the Subscriber's self-funded group plans. As explained below, Keenan's members, which are BSCA Subscribers, are not confined to the State of California, and routinely receive hospital services in other states, including Nevada, for which Keenan is responsible.

6.    This Court has personal jurisdiction over BSCA and Keenan because they conduct substantial business in Nevada, and a substantial part of the events or omissions giving rise to the

Hospitals' claims occurred here. BSCA and Keenan insure and administer health plans and health insurance policies that cover Nevada residents, including the BSCA Subscribers whom the Hospitals provided medical services to in this case. BSCA and Keenan therefore do business in the State of Nevada for purposes of personal jurisdiction, and it is reasonably foreseeable that they would be brought into a Nevada court for their actions in connection with insuring and administering health plans that cover health services provided to BSCA's Subscribers in Nevada.

7.    This Court has subject-matter jurisdiction because this dispute is between citizens of different states (The Hospitals are citizens of the State of Nevada, and Defendants are citizens of the State of California) and involves an amount in controversy of greater than $75,000.

8.    Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district—as described below, the Hospitals in which medical services were provided to the BSCA Subscribers are located in Las Vegas, Nevada, which is located in the District of Nevada, thus making venue proper under 28 U.S.C. § 1391(b)(2). Venue is also proper under 29 U.S.C. § 1132(e)(2) because the Hospitals have asserted a claim under ERISA and the breach of the health plan at issue also took place (in part) in this judicial district, as BSCA denied reimbursement for medical services provided in the District of Nevada.

## B.    FACTUAL BACKGROUND

## I.    THE BLUECARD PROGRAM

9.    The Hospitals are acute care hospitals located in Las Vegas, Nevada. The Hospitals provide medically necessary services to Las Vegas and the surrounding communities.

10.    As part of their provision of medically necessary services to the communities they serve, the Hospitals are contracted with non-party Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield and HMO Colorado, Inc. d/b/a HMO Nevada ("Anthem NV") through a Facility Agreement (eff. Oct. 1, 2015) (as amended, the "Agreement"). The Agreement specifies the terms and conditions under which the Hospitals will treat patients with Blue Cross and Blue Shield ("BCBS") health plans (referred to in the Agreement as "Subscribers")

1    and be reimbursed for that treatment. Under the Agreement, the Hospitals are entitled to be paid

2    specified rates for the provision of medically necessary services to a Subscriber.

3        11.    However, the Agreement is far broader than the relationship between just the

4    Hospitals and Anthem NV and Subscribers enrolled in an Anthem NV health plan. The Agreement

5    applies to the treatment that the Hospitals provide to any Subscriber enrolled in a BCBS health plan,

6    including Subscribers who have BCBS health insurance through another state's Blue Cross and/or

7    Blue Shield licensee (like BSCA). Thus, the Agreement applies to treatment that the Hospitals

8    provide to BSCA Subscribers.

9        12.    When the Hospitals treat a Subscriber who has a BCBS-branded health plan that is

10   administered or underwritten by a Blue Cross (and Blue Shield) licensee other than Anthem NV, the

11   Agreement still governs the Hospitals' provision of that treatment and reimbursement for it. The

12   Hospitals' requests for payment (referred to as a "Claim") are handled through a system known as

13   the "BlueCard Program." Under the BlueCard Program, the Hospitals submit their claims to Anthem

14   NV for the services it provided to a Subscriber. Anthem NV then reviews the claim, determines the

15   amount that would be payable under the Agreement for the services that the Hospitals provided to

16   the Subscriber, and forwards the claim to the BCBS health plan that covers the Subscriber (referred

17   to as the "Home Plan"). The Home Plan then applies the Subscriber's health benefits, makes

18   coverage determinations, and either denies payment for the services, or approves payment. Anthem

19   NV then transmits the Home Plan's decision and payment to the Hospitals. Importantly, the payment

20   rates specified in the Agreement between Anthem NV and the Hospitals govern the amount the

21   Hospitals are entitled to be reimbursed for the services provided to the Subscriber, regardless of

22   whether that Subscriber is a participant in an Anthem NV health plan or another state's BCBS health

23   plan.

24       13.    As is explained in more detail below, this dispute involves the Hospitals' provision of

25   hospital services to four BSCA Subscribers, including one Keenan plan participant, that are payable

26   under the Agreement and for which BSCA and Keenan incorrectly refused to pay the Hospitals. The

27   Subscribers received covered services from the Hospitals, and BSCA and its Affiliates are obligated

28

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

1  to approve coverage for those services under the Subscribers' respective health plans and issue

2  payment to the Hospitals for same.

3       **II.    FACTS CONCERNING PRESENT CLAIMS**

4       14.    <u>Patient No. 1- C.C.- Admitted March 29, 2017, Discharged March 29, 2017</u>: Patient

5  C.C. presented to Sunrise on March 29, 2017, for scheduled elective surgery in the form of maxillary

6  and mandibular osteotomies.  C.C. had a history of craniofacial syndrome including plagiocephaly

7  and was status-post a cranioplasty as an infant.  C.C. had also suffered damage to her vocal cords

8  from prolonged intubation as an infant.  C.C. had undergone two years of pre-surgical orthodontics.

9  Patient tolerated the procedure without difficulty and was placed in the intensive care unit ("ICU")

10 post-operatively in order to protect her airway due to having her jaw wired shut from the surgery.

11 C.C. progressed well and was transferred to the medical-surgical floor.  On March 31, 2017, C.C.

12 was determined to be medically stable and was discharged home.

13      15.    Per Anthem NV's Medical Policy SURG.00049, an elective Mandibular/Maxillary

14 (Orthognathic) surgery will be considered to be medically necessary from a "reconstructive"

15 standpoint when the procedure is "intended to address a significant variation from normal related to

16 accidental injury, disease, trauma, treatment of a disease or congenital defect." C.C.'s medical

17 records, previously provided to Anthem NV and BSCA, demonstrate that she had a history of

18 craniofacial syndrome including plagiocephaly, and that she was born prematurely with maxillary

19 and mandibular skeletal dysplasia, including severe midface deficiency, maxillary deficiency,

20 mandibular excess, and multiple of asymmetries of the maxilla and mandible.  As such, the

21 orthognathic surgery performed by the oral and maxillofacial surgeon on March 29, 2017, was

22 medically necessary based upon Anthem NV's Medical Policy.

23      16.    The procedure and two (2) days of post-operative observation were authorized by

24 BSCA, pursuant to authorization number 0250022856.

25      17.    Section 2.21 of the Agreement provides:

26          if Plan gives initial authorization to Facility that the services in question
            are approved and are Covered Services and Facility provides such
27          services in reliance thereupon, Plan may not retroactively deny payment
            for such services unless the authorization was based upon a material

28

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

misrepresentation of information or omission about the Covered Individual's health condition or the cause of the health condition.

Regardless of any past, present or future provision, policy, procedure, methodology, rule, manual, guideline, UR criteria or other data/document/process, and/or any change therein, to the contrary, Plan shall reimburse Facility pursuant to the authorization issued by Plan.

18.    Sunrise timely submitted its claim for reimbursement for the services it provided to C.C. to Anthem NV on April 5, 2017, which determined the amount payable to Sunrise under the Agreement and transmitted the claim to BSCA to adjudicate coverage and benefits.  By remittance dated June 19, 2017, Sunrise's claim was denied due to C.C.'s diagnoses purportedly not being covered.

19.    Sunrise timely submitted a first level appeal with medical records on September 20, 2017.  On November 22, 2017, BSCA sent a letter to Sunrise stating that the claim determination was being upheld. On November 30, 2017, BSCA sent a letter to Sunrise stating that it had researched the claim, and was "adjusting" and "pricing" the claim, to pay the Hospital in the amount of $29,654.11.  BSCA further directed Sunrise to contact Keenan for further information. Neither BSCA nor Keenan ever remitted payment to Sunrise.

20.    On December 26, 2017, Sunrise timely submitted a second level appeal.  On March 7, 2018, Keenan denied the appeal due to a purported lack of medical necessity.

21.    To date, neither BSCA nor Keenan have denied payment of the claim on the basis that Sunrise proffered any material misrepresentation of information or omission regarding C.C.'s health condition or the cause of her health condition.  In fact, the only reason supplied through its explanation of benefits ("EOB") and appeal denials has been "diagnosis not covered" and "medical necessity." Thus, BSCA or Keenan must reimburse Sunrise for the medical treatment provided to C.C. in compliance with the Agreement.

22.    In sum, Sunrise provided medically necessary services to C.C. and is entitled to payment in full for those services.  According to the terms of the Agreement, Sunrise is entitled to be paid $29,654.11 for the medically necessary services provided to C.C.

23.    <u>Patient No. 2 - P.U. – Admitted May 5, 2021, Discharged May 14, 2021:</u> Patient P.U. presented to the Emergency Department ("ED") at MountainView on May 5, 2021, with shortness of

breath. He had a prior medical history that included chronic obstructive pulmonary disease ("COPD"), congestive heart failure ("CHF"), diabetes, and hypertension. Patient advised the ED of his increased need for supplemental oxygen, and that his oxygen saturation level remained low at 90% despite the increase in oxygen. On physical exam, P.U. was wheezing and had bibasilar rales when listening to his lungs. In addition, he had 2 plus pitting lower extremity edema. A chest x-ray showed vascular congestion and bibasilar atelectasis. An electrocardiogram demonstrated no acute ischemic changes. P.U. was admitted to the Hospital per physician order, followed by consultations with MountainView's Cardiology and Pulmonology departments.

24.     On May 6, 2021, MountainView's Cardiology department consulted on the case and reviewed a CT scan of the chest that showed air trapping and a mosaic pattern, which led to P.U.'s physician implementing a plan of intravenous (IV) diuresis and close monitoring of P.U.'s renal function. P.U.'s received Duonebulizer treatments, IV Solumedrol, IV Heparin, and IV Lasix. MountainView's Pulmonologists consulted on the case on May 7, 2021, and increased the diuresis. Demedex was initiated twice per day on May 8, 2021. The next day, May 9, 2021, P.U.'s Lasix frequency was changed to twice per day from once daily. He continued with Duonebulizer treatments and IV Solumedrol.

25.     An echocardiogram was performed on May 10, 2021, which showed an ejection fraction of 35%. Oral antibiotics were started and the IV Solumedrol rate was decreased. On May 11, 2021, P.U.'s cardiologist noted that the patient was diuresing well. Intravenous Amiodarone was started on May 12, 2021, for a cardiac arrhythmia. P.U. reverted back to a rapid ventricular rate on May 13, 2021, at which point his cardiologist added IV Digoxin for the patient's CHF. On May 13, 2021, P.U.'s evening dose of IV Lasix was held because his creatinine level had risen. On May 14, 2021, P.U. returned to his baseline supplemental oxygen of 3 liters, and was deemed to be medically stable for discharge.

26.     MountainView timely submitted its claim for reimbursement for the services provided to P.U. to Anthem NV on June 8, 2021, which determined the amount payable to MountainView under the Agreement and transmitted the claim to BSCA to adjudicate coverage and

benefits.  By remittances dated May 7, 2021, and May 18, 2021, BSCA denied MountainView's claim for a purported lack of medical necessity.

27.    MountainView timely submitted a first level appeal on July 13, 2021.  On September 9, 2021, a MountainView representative called BSCA who advised that the denial was being upheld due to a purported lack of medical necessity.   MountainView filed a second level appeal on October 4, 2021.  On November 10, 2021, BSCA again upheld the denial due to a purported lack of medical necessity.

28.    With regard to P.U.'s admission from May 5, 2021, to May 14, 2021, the admission was medically necessary. P.U. presented to the ED with shortness of breath and an increased need for supplemental oxygen from his normal baseline rate. His oxygen saturation was less than 90%, below the acceptable level. On physical examination, P.U. had 2 plus pitted edema of his bilateral lower extremities and his lungs had wheezing and bibasilar rales. Given the patient's underlying health conditions of COPD and CHF, as well as his current symptomology, physical examination and diagnostic test results, the treating physician determined that P.U. should be admitted to the Hospital. A review of the medical record, previously provided to Anthem NV and BSCA, demonstrates that P.U.'s case was followed by the Cardiology and Pulmonology departments, which carefully monitored P.U.'s diuresis and kidney function. P.U. also required Duonebulizer treatments and IV Solumedrol for his COPD. Later in his admission, P.U. developed a cardiac arrhythmia which necessitated IV Amiodarone and IV Digoxin to help his heart pump more efficiently.  Around this time, P.U.'s Lasix needed to be held because his creatinine level increased. However, once P.U. returned to his baseline level regarding his supplemental oxygen, he was discharged from the Hospital.

29.    In sum, MountainView provided medically necessary services to P.U. and is entitled to payment in full for those services.  According to the terms of the Agreement, MountainView is entitled to be paid $45,549.81 for the medically necessary services provided to P.U.

30.    <u>Patient No. 3 – I.F. – Admitted August 11, 2021, Discharged August 22, 2021</u>: Patient I.F. presented to the ED of Southern Hills on August 11, 2021, per the recommendation of her primary care physician, for further evaluation due to an abnormal MRI showing spinal cord

1 | compression. I.F. stated that she had been developing worsening full body aches as well as back
2 | pain, rib pain, and lower extremity pain. She also told the ED physician that she was having lower
3 | extremity weakness. I.F. advised that she had had numerous imaging performed as an outpatient. A
4 | chest x-ray and CT scan of the thoracic spine and chest were performed. The CT scan showed
5 | extensive metastatic disease to the bones, expansile rib lesions, and diffuse bone metastasis. Blood
6 | tests revealed a significantly elevated protein level which was concerning for possible multiple
7 | myeloma. I.F. was admitted to Southern Hills per physician order for further evaluation with
8 | consultations requested with Southern Hills' Neurosurgery and Oncology departments. She was
9 | started on intravenous (IV) fluids, IV steroids, and IV pain medication.

10 | 31. Due to anemia, I.F. received a unit of packed red blood cells on August 12, 2021.
11 | Southern Hills' Hematology and Oncology departments evaluated the patient on the same day with
12 | the recommendation for a bone marrow biopsy. Neurosurgery reviewed the patient's various
13 | diagnostic tests and determined there was no surgical indication. A bone marrow biopsy was
14 | performed on I.F. on August 13, 2021. She continued to receive pulse Dexamethasone dosing on
15 | August 14, 2021. I.F. had severe pain and difficulty with pain control during her whole admission.
16 | On August 15, 2021, her opiate dosage was increased, and a Toradol and lidocaine patch were added
17 | to her pain regimen. I.F. had been receiving Percocet and IV Morphine before the changes in pain
18 | medication. Due to the difficulty in controlling the patient's pain, Palliative Care was consulted. On
19 | August 18, 2021, I.F.'s bone marrow biopsy results became available and were consistent with
20 | multiple myeloma. Gabapentin was added for neuropathic pain. I.F. was advised she was a transplant
21 | candidate and that she would need radiation treatment for her spinal lesions. Ultimately, I.F. opted to
22 | be discharged with home health and durable medical equipment (bed). Palliative Care was arranged
23 | as were referrals for Oncology specialists. On August 22, 2021, I.F. was deemed medically stable
24 | and was discharged from the Hospital after home health services and durable medical equipment
25 | were arranged.

26 | 32. Southern Hills timely submitted its claim for reimbursement for the services provided
27 | to P.U. to Anthem NV on July 31, 2021, which determined the amount payable to Southern Hills
28 | under the Agreement and transmitted the claim to BSCA to adjudicate coverage and benefits.  By

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

remittance dated September 11, 2021, BSCA denied Southern Hills' claim for a purported lack of medical necessity.

33.    Southern Hills timely submitted a first level appeal on September 21, 2021.  On December 14, 2021, BSCA sent correspondence to Southern Hills advising that the denial was upheld due to a purported lack of medical necessity.   Southern Hills filed a second level appeal on December 21, 2021.  On January 18, 2022, BSCA again upheld the denial of the appeal, due to a purported lack of medical necessity.

34.    Southern Hills' provision of care to I.F. was medically necessary.  I.F. presented to the ED at the direction of her primary care doctor due to an abnormal MRI showing spinal cord compression and worsening pain. Diagnostic testing in the ED demonstrated that the patient had metastatic disease that was diffuse and to the bones. Blood tests were suspicious for multiple myeloma as the primary source of the cancer given the elevated protein levels. She was admitted to the Hospital for further testing by specialists to confirm what would be a new cancer diagnosis and determination of possible surgical intervention for the lesions causing spinal cord compression. Although Neurosurgery did not find a surgical indication, Oncology recommended a bone marrow biopsy. The biopsy results confirmed the initial suspicions of multiple myeloma. Throughout the patient's admission she was administered pulse steroid dosage. In addition, the medical records demonstrate the patient's high levels of pain and difficulty in controlling her pain. More specifically, I.F. was receiving Percocet and IV Morphine, but Toradol and a lidocaine patch were added and the dosage of her opiate medication was increased. Because the addition of pain medication and increased dosage of opiates did not help with pain control, Palliative Care was requested to consult on the case. Eventually, Gabapentin was added to I.F.'s pain regimen for neuropathic pain.

35.    From a pain severity, pain control, and pain medication regimen standpoint alone, the patient's admission was medically necessary as she received multiple modalities and types of pain medication, with increases in dosage and new medications being initiated during her hospitalization in an attempt to alleviate the symptoms from her cancer.

36. In sum, Southern Hills provided medically necessary services to I.F. and is entitled to payment in full for those services. According to the terms of the Agreement, Southern Hills is entitled to be paid $54,744.10 for the medically necessary services provided to I.F.

37. <u>Patient No. 4 – G.H. – Admitted December 1, 2021, Discharged December 8, 2021:</u> Patient G.H. presented to MountainView's ED with complaints of increased shortness of breath ("SOB"). G.H. had a past medical history of obesity and congestive heart failure with pulmonary hypertension. Upon evaluation in the ED, Patient was noted to have increased edema to lower extremities and elevated cardiac enzymes. Patient was also noted to have refractory swelling despite being compliant with oral Lasix. Patient was admitted inpatient per physician order, administered IV Lasix due to volume overload, and was closely monitored. On December 6, 2021, G.H.'s edema worsened and IV Lasix administration was increased to three times a day. G.H. improved over the following days and was discharged home in stable condition on December 8, 2021, after being cleared by MountainView's Cardiology and Nephrology departments.

38. BSCA denied MountainView's request for authorization due to a purported lack of medical necessity on December 7, 2021. MountainView timely submitted its claim for reimbursement for the services provided to G.H. on December 18, 2021, which determined the amount payable to MountainView under the Agreement and transmitted the claim to BSCA to adjudicate coverage and benefits. By remittance dated December 29, 2021, BSCA denied MountainView's claim for a lack of authorization.

39. MountainView submitted a first level appeal on January 18, 2022. On February 15, 2022, BSCA denied the appeal due to a lack of authorization. MountainView submitted a second level appeal on March 29, 2022, and BSCA, once again, upheld its denial on May 17, 2022.

40. BSCA's denial for authorization and subsequent denials for coverage are due to G.H.'s care purportedly lacking medical necessity. However, MountainView's provision of care to G.H. was medically necessary.

41. A review of G.H.'s medical records establishes that G.H.'s treatment was medically necessary under the Agreement. G.H. presented to the Hospital's ED with complaints of increased SOB. G.H. had a history of obesity and congestive heart failure with pulmonary hypertension. Upon

1    evaluation, G.H. was noted to have increased edema to her lower extremities and elevated cardiac

2    enzymes. G.H. was admitted inpatient per physician order and started on IV Lasix, which was

3    increased as needed. G.H. improved over the following days and was discharged home in stable

4    condition on December 8, 2021, after being cleared by Cardiology and Nephrology.

5         42.    In sum, MountainView provided medically necessary services to G.H. and is entitled

6    to payment in full for those services.  According to the terms of the Agreement, MountainView is

7    entitled to be paid $29,118.00 for the medically necessary services provided to G.H.

**D.    CAUSES OF ACTION**

**COUNT I – FAILURE TO COMPLY WITH HEALTH BENEFIT PLAN IN VIOLATION OF ERISA**

10        43.    The foregoing paragraphs are incorporated by reference.

11        44.    As explained above, the Hospitals provided medically necessary covered services to

12    the Subscribers described above, who were BSCA Subscribers. The Hospitals are therefore entitled

13    to be paid the amounts due under the Agreement for that care.

14        45.    BSCA and Keenan are indirect Parties to the Agreement, as the Agreement applies to

15    the Hospitals' treatment of BSCA's Subscribers. The Hospitals are also entitled to payment under

16    the terms of the Subscribers' health insurance policies, because the services at issue were medically

17    necessary covered services that are covered by such Subscribers' health plans.

18        46.    Upon information and belief, the Subscribers whose hospital admissions are at issue

19    are Subscribers to an employer-sponsored health plan that BSCA administers or underwrites. Thus,

20    upon information and belief, the Employee Retirement Income Security Act of 1974 ("ERISA")

21    governs the Subscribers' health plans.

22        47.    The Hospitals are entitled to enforce the terms of the Subscribers' health insurance

23    plans as the Subscribers' assignee under 29 U.S.C. § 1132(a)(1)(B). Upon admission, the

24    Subscribers signed a form, often referred to as Conditions of Admission, that included an assignment

25    of the Subscribers' health insurance benefits and rights to the Hospitals.

26        48.    As explained above, the Hospitals provided medically necessary services to the

27    Subscribers at issue. Those services qualify as covered services under the Subscribers' health plans,

28

1  and BSCA and Keenan are therefore obligated to provide benefits coverage for the medically

2  necessary services provided by the Hospitals.

3      49.    As explained above, BSCA and Keenan failed to pay the Hospitals for the covered

4  services that it provided to the Subscribers. BSCA and Keenan's wrongful adverse benefit

5  determination for the medically necessary hospital services that the Hospitals provided to the

6  Subscribers breached the terms of the Subscribers' health plans, which the Hospitals have standing

7  to sue under through the Subscribers' assignments of benefits.

8      50.    As a direct and proximate result of BSCA and Keenan's breach of the Subscribers'

9  health plans, the Hospitals have been damaged in an amount in excess of the jurisdictional limits of

10  this Court. The Hospitals are entitled to recover payment in an amount not less than $159,066.02 for

11  the medically necessary covered services they provided to the Subscribers as pled above.

12              **COUNT II- BREACH OF CONTRACT (FOR PLANS NOT SUBJECT TO ERISA)**

13      51.    The foregoing paragraphs are incorporated by reference.

14      52.    As alleged above, the Hospitals provided medically necessary covered services to the

15  Subscribers whose hospital admissions are at issue, and those services are covered under the terms of

16  the Subscribers' health plans. To the extent that the health plans are not subject to ERISA, the

17  Hospitals are entitled to recover payment under the plans under a common law claim for breach of

18  contract.

19      53.    Each health plan is a contract between the Subscriber and BSCA and Keenan under

20  which BSCA and Keenan agreed to cover medically necessary covered medical services that the

21  Subscriber receives. The Hospitals have standing to sue for breach of contract for BSCA and

22  Keenan's failure to pay for the medical services that the Subscribers' received from the Hospital

23  because the Subscribers assigned their health insurance benefits to the Hospital.

24      54.    The Hospitals performed their obligations under the Subscribers' health plans by

25  providing medically necessary covered services to the Subscribers.

26      55.    BSCA and Keenan breached the Subscribers' health plans by failing to issue payment

27  to the Hospitals at the rates set forth in the Agreement for the medically necessary covered services

28  that the Hospitals provided.

BAILEY❖KENNEDY
8984 SPANISH RIDGE AVENUE
LAS VEGAS, NEVADA 89148-1302
702.562.8820

56.    The Hospitals suffered damages as a direct and proximate result of BSCA's and Keenan's breach of the Subscribers' health plans; specifically, the Hospitals are entitled to be reimbursed in an amount not less than $29,654.11 from BSCA and Keenan for the medically necessary covered services that the Hospitals provided to the Subscriber C.C. as pleaded above and not less than $129,411.91 from BSCA for the medically necessary covered services the Hospitals provided to the other Subscribers as pleaded above.

57.    As a further result of BSCA and Keenan's breaches, the Hospitals have been forced to incur attorneys' fees and legal expenses and have suffered damages associated with such fees and expenses that they are entitled to recover as special damages.

**COUNT III- UNJUST ENRICHMENT (PLED IN THE ALTERNATIVE)**

58.    The foregoing paragraphs are incorporated by reference.

59.    As alleged above, the Hospitals conferred a benefit on BSCA and Keenan, through the provision of services and treatment to the Subscribers whose hospital admissions are at issue.

60.    BSCA and Keenan received and unjustly retained the valuable benefit the Hospitals' conferred on them against the fundamental principles of justice or equity and good conscience.

61.    BSCA and Keenan have unjustly retained these benefits from the Hospitals under circumstances where it would be unequitable for BSCA and Keenan to retain those benefits without payment of the value thereof.

62.    The Hospitals suffered damages as a direct and proximate result of BSCA and Keenan's actions; specifically, the Hospitals are entitled to be reimbursed in an amount not less than $159,066.02 under the Agreement for the medically necessary covered services that the Hospitals provided to the Subscribers.

63.    As a further result of BSCA and Keenan's actions, the Hospitals have been forced to incur attorneys' fees and legal expenses and have suffered damages associated with such fees and expenses that they are entitled to recover as special damages.

**CONDITIONS PRECEDENT**

64.    All conditions precedent have been performed or have occurred.

**ATTORNEYS' FEES**

65.    The foregoing paragraphs are incorporated by reference.

66.    The Hospitals are entitled to an award of attorneys' fees under 29 U.S.C. § 1132(g).

**JURY DEMAND**

The Hospitals hereby demand a trial by jury of the above-styled action for all claims for which a jury is available.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Sunrise MountainView Hospital, Inc. d/b/a MountainView Hospital; Sunrise Hospital and Medical Center LLC d/b/a Sunrise Hospital & Medical Center; and Southern Hills Medical Center, LLC d/b/a Southern Hills Hospital & Medical Center hereby requests that Defendants Blue Shield of California, Inc. and Keenan & Associates, Inc. be cited to appear and answer this Original Complaint, and that upon final trial and determination thereof, that judgment be entered in favor of the Plaintiffs awarding them the following relief:

A.    An award of damages in excess of $75,000 for the amount due under the Agreement and the terms of the Subscribers' health plans;

B.    Reasonable attorneys' fees and court costs; and

C.    Such other and further relief to which the Hospitals may be entitled.

DATED this 30th day of November, 2023.

**BAILEY❖KENNEDY**

By: /s/ Joshua M. Dickey
JOSHUA M. DICKEY
PAUL C. WILLIAMS
REBECCA L. CROOKER
*Attorneys for Plaintiffs*